IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ESSIE TURNER, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. |
| | § | 3:03-CV-2139-P |
| v. | § | |
| | § | |
| BAYLOR RICHARDSON MEDICAL | § | |
| CENTER, a/k/a RICHARDSON | § | |
| MEDICAL CENTER FOUNDATION, | § | |
| and RICHARDSON HOSPITAL | § | |
| AUTHORITY, | § | |
| | § | |
| Defendants. | § | |

## **MEMORANDUM OPINION AND ORDER**

Now before the Court are the following Motions:

1.    Defendants' Motion for Summary Judgment, filed December 13, 2004,[1]

2.    Plaintiff's Objections and Motion to Strike Defendants' Summary Judgment Evidence ("Plaintiff's First Motion to Strike"), filed January 11, 2005,[2]

3.    Defendants' Motion to Strike Plaintiff's Sham Affidavit, Evidentiary Objections to Plaintiff's Summary Judgment Proof, and for Award of Attorney's Fees ("Defendants' Motion to Strike"), filed January 21, 2005,[3]

4.    Plaintiff's Objections and Motion to Strike Defendants' Motion to Strike and Appendix in Support of Defendants' Motion to Strike ("Plaintiff's Second Motion

---

[1] Plaintiff filed a Response on January 11, 2005, and Defendants filed a Reply on January 21, 2005.

[2] Defendants filed a Response on January 14, 2005, and Plaintiff filed a Reply on January 21, 2005.

[3] Plaintiff filed a Response on January 29, 2005, and Defendants filed a Reply on February 8, 2005. However, as the Court denies Plaintiff's Motion for Leave to File an Oversized Brief and Supplemental Appendix in Support of Plaintiff's Response to Defendants' Motion to Strike, *see infra* p. 19, the Court does not consider Plaintiff's Response or Defendants' Reply to Defendants' Motion to Strike.

**Page 1 of 25**

to Strike"), filed January 29, 2005,[4] and

5.      Plaintiff's Motion for Leave to File an Oversized Brief and Supplemental
        Appendix in Support of Plaintiff's Response to Defendants' Motion to Strike
        ("Plaintiff's Motion for Leave"), filed January 29, 2005.[5]

After a thorough review of the pleadings, the briefing, the summary judgment evidence, and the

applicable law, the Court GRANTS Defendants' Motion for Summary Judgment.  The Court

DENIES as MOOT a portion of Plaintiff's First Motion to Strike, a portion of Defendants'

Motion to Strike, Plaintiff's Second Motion to Strike, and Plaintiff's Motion for Leave.  To the

extent Plaintiff's First Motion to Strike and Defendants' Motion to Strike are not denied as moot,

the Motions are simply DENIED.

## I.      Background

        Plaintiff Essie Turner ("Turner") is an African American female.  (Pl.'s Compl. ¶ 5.)

Defendant Richardson Hospital Authority ("RHA") is a governmental subunit of the State of

Texas that operates as a general hospital in Richardson, Texas.  (Pl.'s Compl. ¶ 2.)

Baylor/Richardson Medical Center Foundation, Inc. ("Foundation"), also a defendant, is a not

for profit corporation that fund-raises for the hospital and publicizes the availability of the

hospital's services.  (Defs.' App. at 55, 65, 78.)

        RHA hired Turner for a secretary position in June of 1999.  *Id.* at 94.  Although Turner

was officially employed by RHA, her services benefitted the Foundation.  (*See* Defs.' App at 56,

118-120; Pl.'s App. at 14.)  Turner held this position until her termination in April of 2002.

(Pl.'s App. at 1.)  Throughout Turner's employment, a maximum of two RHA employees

---

[4] Defendants filed a Response on February 8, 2005, and Plaintiff filed a Reply on February 8, 2005.

[5] Defendants did not file a Response.

**Page 2 of  25**

worked for the Foundation.  (Defs.' App. at 69-70, 76.)  Turner acted as the Foundation's secretary, and another employee acted as her supervisor and Director of the Foundation.  *Id.*

As the Foundation's secretary, Turner prepared weekly reports reflecting the Foundation's progress toward achieving its goals.  *Id.* at 6.  These progress reports were to be finished each Friday by 1:00 p.m. so the Foundation's officers and board members, who were volunteers, could have access to them over the weekend.  *Id.* at 6, 65, 84.

From June 2001 to January 2002, the Foundation did not have a director, and Turner was the only employee working for the Foundation.  *See id.* at 57.  During that time, the Chief Executive Officer of RHA, Ronald L. Boring ("Boring"), acted as Turner's supervisor.  (Pl.'s App at 38; Defs.' App. at 74-75.)  However, as Turner was the only employee in the Foundation's office, she essentially ran the office herself with minimal supervision.  (Pl.'s App at 38; Defs.' App. at 74-75.)  Boring enjoyed working with Turner (Pl.'s App at 45), and while he acted as her supervisor, Turner received a merit-based pay raise.  *See id.* at 120-124. Additionally, Boring awarded Turner a bonus for managing the office alone.  *Id.* at 53.

Toward the end of 2001, the Foundation's offices were moved from RHA's main campus to a building across the street from the main campus.  (Defs.' App at 76.)  Shortly afterwards in January 2002, RHA hired Mary Colston ("Colston") to act as Director of the Foundation and Turner's supervisor.  (Pl.'s App. at 1.)  In the course of Colston and Turner's working relationship, difficulties developed between them.  Turner e-mailed Boring and Connie Wright ("Wright"), RHA's Director of Human Resources, regarding the difficulties.  (*See id.* at 117.) Wright attempted to address Turner's concern in a meeting.  *Id.* at 93.  Boring did not respond to the e-mail, *id.* at 51, but he was surprised that Colston had trouble working with Turner and unhappy that Colston could not better manage the conflict.  *Id.* at 44, 48.

According to Defendants, the difficulties arose and Plaintiff was ultimately terminated because Plaintiff repeatedly failed to timely finish her work in the manner requested, would not follow the work schedule established by her employer, and spent excessive amounts of time attending to personal visits, phone calls and e-mails during business hours.  (Defs.' Br. in Supp. of Mot. Summ. J. at 19.)  Defendants further contend that when counseled about these problems, Plaintiff showed an unwillingness to change her behavior, and on at least one occasion, Plaintiff ridiculed her supervisor to officers and board members of the Foundation.  *Id.*  For these reasons, Defendants contend, Plaintiff was suspended and then terminated in accordance with the disciplinary procedures set out in RHA's employee handbook.  *Id.* at 19-20.

Plaintiff denies Defendants' account of her work performance, and asserts instead that the difficulties arose when Colston began making derogatory racial remarks and references to Turner.  (Pl.'s Resp. at 3.)  Specifically, Colston told Turner stories about work she had done with inner-city children, calling them "ghetto children."  (Defs.' App. at 99.)  When Turner told Colston she did not want to hear these stories, however, Colston did not mention her work with children again.  *Id.* at 102.  Subsequently, when Turner mentioned to Colston that she was considering taking college classes, Colston told Turner about a program in which university classes were offered at night for African-American students who could not qualify for regular admission.  *Id.* at 99-100.  Colston also exhibited what Turner believed to be surprise or disdain when Colston learned that Turner shopped regularly at an upscale shopping mall, that Turner's son bought and sold cars on credit for a hobby, and that Turner drove a Volvo.  *Id.* 100-101.  Plaintiff also complains that Colston reacted with surprise when Turner completed a project or report, became angry with Turner for "no rational reason," and falsely accused Turner of having a poor work performance.  (Pl.'s App. at 2, 13.)

**Page 4 of  25**

Furthermore, Plaintiff asserts that Defendants failed to follow the disciplinary procedures set out in the employee handbook prior to her termination. (Pl.'s Br. in Resp. at 14-15.) Plaintiff asserts that on one occasion when discussing Turner, Colston told Boring that she expected Turner to use her "race card." (Pl.'s App. at 55.) Plaintiff also points out that Colston was often held accountable for the mistakes attributed to Turner. *Id.* at 26, 46-47. Nonetheless, Boring allowed Colston to decide whether to terminate Turner. *Id.* at 48-49.

Shortly after Turner was terminated, her position was filled by Jenna Holtz, a Caucasian female. (Pl.'s App. at 67, 79.) Less than five months later, Colston resigned. (Pl.'s Br. in Resp. at 17.)

In January 2003, Turner filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (*See* Defs.' App. at 137.) In her charge, Turner specified the Foundation as her employer, listed the number of employees as 500, and identified Colston as her supervisor. *See id.* On June 19, 2003, the EEOC issued Turner a Notice of Right to Sue. *See id.* at 144-145. Plaintiff then filed her Complaint on September 19, 2003, alleging race discrimination, harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1991, as amended, and 42 U.S.C. § 1981. Defendants now move for summary judgment on all of Plaintiff's claims. As Plaintiff concedes that RHA is not liable for her § 1981 claims (Pl.'s Br. in Resp. at 11), the Court only addresses Plaintiff's § 1981 claims against the Foundation and Plaintiff's Title VII claims against both Defendants.

## II.    Summary Judgment Legal Standard

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no

genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party bears the burden to inform the district court of the basis for its belief that there is an absence of a genuine issue for trial, and identify those portions of the record that demonstrate such an absence.  *Id.*  However, all evidence and the reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Once the party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The party defending against the motion for summary judgment cannot defeat the motion unless she provides specific facts that show the case presents a genuine issue of material fact, such that a reasonable jury might return a verdict in her favor.  *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).  Mere assertions of a factual dispute unsupported by probative evidence will not prevent a summary judgment.  *Id.* at 248-50; *Abbot v. Equity Group, Inc.,* 2 F.3d 613, 619 (5th Cir. 1993).  In other words, conclusory statements, speculation and unsubstantiated assertions will not suffice to defeat a motion for summary judgment.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc).  Moreover, when the non-movant fails to provide a response identifying the disputed issues of fact, the Court is entitled to accept the movant's description of the undisputed facts as prima facie evidence of its entitlement to judgment.  *Eversly v. MBank Dallas*, 843 F.2d 172, 173-174 (5th Cir. 1988); *Nordar Holdings, Inc. v. W. Sec. (USA) Ltd.*, No. 3:96-CV-0427-H, 1996 WL 739019, at *2 (N.D. Tex. Dec. 18, 1996).

**Page 6 of 25**

Finally, the Court has no duty to search the record for triable issues. *Ragas v. Tenn. Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir. 1998). "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise matter in which the evidence supports his or her claim." *Id.* A party may not rely upon "unsubstantiated assertions" as competent summary judgment evidence. *Id.*

## III. Jurisdictional Matters

### A. Timely Complaint

Title VII provides that a claimant has ninety days to file a lawsuit after he or she *receives* a Notice of Right to Sue ("right-to-sue letter") from the EEOC. *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 379 (5th Cir. 2002). When parties' dispute the date a plaintiff received a right-to-sue letter, courts have presumed various receipt dates ranging from three to seven days after the letter was mailed. *Id.*

Defendants argue that Turner failed to timely file her complaint because she did not file her complaint ninety days after her right-to-sue letter was *sent*. (Defs.' Br. in Supp. of Mot. Summ. J. at 28.) Plaintiff's right-to-sue letter was issued and sent on June 19, 2003, ninety-two days before Plaintiff's Complaint was filed on September 19, 2003. (Defs.' App. at 144.) However, Plaintiff asserts that she did not *receive* her EEOC letter until after June 25, 2003. (Pl.'s App. at 15.) This assertion is evidenced by the fact that the envelope that contained Plaintiff's right-to-sue letter has a forwarding sticker attached indicating that the letter was forwarded on June 25, 2003. (Pl.'s App. at 107.) Thus, Plaintiff had ninety days after June 25, 2003 to file her lawsuit, and her Complaint was timely. Even if the Court adopted a minimum presumption of three days for receipt of the right-to-sue letter, Plaintiff's Complaint would be timely.

### B.     Employer Status

As Title VII prohibits discrimination in the employment context, *see* 42 U.S.C. § 2000e-2(a), 2000e-5, generally only employers may be held liable under Title VII. *See Oden v. Oktibbeha County, Miss.*, 246 F.3d 458, 462 (5th Cir. 2002). Section 1981 also prohibits discrimination, but is not limited to the employment context. 42 U.S.C. §1981(a) ("All persons within the jurisdiction of the United States shall have the same right in every state and Territory to make and enforce contracts . . ."). In the present case, Plaintiff asserts that the discrimination and retaliation by Defendants, as her employers, impaired her rights relating to her employment contract. (*See* Pl.'s Compl. at 2-4.) Therefore, the existence of an employment relationship between Plaintiff and Defendants is essential to both her Title VII and § 1981 claims.

Defendants argue that Turner was not an employee of the Foundation, and thus, the Foundation is entitled to judgment as a matter of law.[6] (Defs.' Br. in Supp. of Mot. Summ. J. at 27-28.) In her response, Plaintiff does appear to contest Defendants' contention that RHA was Plaintiff's actual employer. She does not provide any evidence showing, for example, that she was paid by the Foundation. She does not dispute that her employment application stated she was an employee of RHA or that her employee handbooks identify her as an employee of RHA. Instead, Plaintiff asserts she should be considered an employee of the Foundation because RHA and the Foundation may be treated as an integrated enterprise.[7] (Pl.'s Br. in Resp. at 10-11.)

Plaintiff relies on *Trevino v. Celanese Corp.*, 701 F.2d 397 (5th Cir. 1983), for the

---

[6] Defendants also argue that the Foundation never had the requisite number of employees to be considered an "employer" under Title VII. (Defs.' Br. in Supp. of Mot. Summ. J. at 27.) The Court does not find it necessary to address this argument, however, as the Court determines that the Foundation was not Plaintiff's employer.

[7] Although Plaintiff uses the term "common enterprise" in her briefing, this doctrine is referred to as "integrated enterprise" in the relevant case law. *See, e.g., Vance v. Union Planters Corp.*, 279 F.3d 295, 297 (5th Cir. 2002). Therefore, the Court uses the term "integrated enterprise."

proposition that two separate entities may be treated as an "integrated enterprise" when the two entities have (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. (Pl.'s Br. in Resp. at 10.) Although *Trevino* remains good law, it involved the application of the integrated enterprise doctrine to private sector employees. *See Trevino*, 701 F.2d at 399, 404 n.10. The Fifth Circuit Court of Appeals has declined to apply this doctrine to government employers, and thus, a government employer may not be considered part of an integrated enterprise. *Id.* at 404 n.10. Hence, this Court cannot treat the Foundation and RHA, a governmental subunit of the State of Texas, as an integrated enterprise. Because the Foundation cannot be considered Plaintiff's employer, Plaintiff's claims against the Foundation must be dismissed as a matter of law. Moreover, the merits analysis below reveals that even if Plaintiff's claims were not dismissed on this basis, they would not survive summary judgment.[8]

### C.    EEOC Charge

Generally, a Title VII lawsuit may only be brought against respondents named in a plaintiff's EEOC charge. Nonetheless, a party not named in an EEOC complaint may be sued under Title VII where the EEOC investigation triggered by the complaint can reasonably be foreseen to include the unnamed party. *Terrell v. United States Pipe & Foundry Co.*, 644 F.2d 1112, 1123 (5th Cir. 1981), *vacated on other grounds*, 456 U.S. 955 (1982). This is because the primary purpose of an EEOC charge is to provide notice of the charges to the respondent and to activate the voluntary compliance and conciliation functions of the EEOC. *Id.* at 1122.

Defendants argue that RHA is entitled to summary judgment because Turner failed to

---

[8] *See infra* pp. 10-16. The standards for analyzing Title VII and § 1981 claims of race discrimination and retaliation claims are the same. *See, e.g., Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002).

specify RHA as a party in her EEOC charge. (Defs.' Br. in Supp. of Mot. Summ. J. at 26-27.) In the instant case, however, RHA was sufficiently implicated in Turner's EEOC charge to have reasonably triggered an investigation of its actions. Although Plaintiff named only the Foundation in her EEOC charge, she listed the number of employees as 500 and identified Colston as her supervisor. (*See* Defs.' App. at 137.) A reasonable investigation or attempt to initiate conciliation would have revealed that RHA, rather than the Foundation, had 500 employees and that both Turner and Colston were employees of RHA although their services benefitted the Foundation. Moreover, RHA would be put on notice because Colston, Turner's named supervisor and the Director of the Foundation, was an RHA employee. Therefore, Plaintiff may pursue Title VII claims against RHA despite her failure to name RHA in the charge.

## IV.    Plaintiff's Title VII Claims

### A.    Race Discrimination

As noted above, under Title VII it is unlawful for an employer to adversely affect the status of an employee because of the individual's race. 42 U.S.C. § 2000e-2(a)(1). To establish a prima facie case of discrimination, a plaintiff may prove his claim through direct evidence, statistical proof, or the tripartite burden-shifting test established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Race discrimination cases based on circumstantial evidence are subject to the *McDonnell Douglas* burden-shifting test. *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 316 (5th Cir. 2004).

Under the *McDonnell Douglas* test, a plaintiff must first establish a prima facie case of race discrimination by showing that: (1) she is a member of a protected class, (2) she was

qualified for her position, (3) she suffered an adverse employment action, and (4) she was replaced by someone outside the protected class. *St Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

The prima facie case, once established, raises a presumption of discrimination, and in the second step of the analysis, the defendant has the burden to rebut this presumption by articulating a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas Corp.*, 411 U.S. at 802; *Shackelford v. DeLoitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999). This burden on the employer is one of production, not persuasion, involving no credibility assessments. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). If the employer carries its burden, the mandatory inference of discrimination created by the prima facie case drops out of the analysis. *Id.*

Plaintiff alleges that she was terminated because of her race. (Pl.'s Br. in Resp. at 12.) For purposes of summary judgment, Defendants concede that Plaintiff has established a prima facie case with respect to this discrimination termination claim. (Defs.' Reply at 8.) Defendants have also articulated legitimate non-discriminatory reasons for Plaintiff's termination. Defendants explain that Plaintiff was terminated because she failed to timely finish her work in the manner requested, she failed to follow the work schedule established by her employer, and she spent excessive amounts of time attending to personal matters during business hours. (Defs.' Br. in Supp. of Mot. Summ. J. at 19.) When Plaintiff was counseled about these problems, she demonstrated an unwillingness to change her behavior. *Id.* In addition, Plaintiff ridiculed her supervisor to officers and directors of the Foundation. *Id.* Thus, whether Plaintiff's claim survives summary judgment turns on the analysis in the third stage of the *McDonnell Douglas*

test.

In the third stage, the plaintiff is given the opportunity to prove that the defendant's proffered reason is merely a pretext for intentional discrimination.  *Hicks*, 509 U.S. at 507-8.  To prevent summary judgment, the plaintiff must establish pretext by showing that "discrimination lay at the heart of the employer's decision."  *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002).  However, if "the evidence of pretext is substantial, the plaintiff may create a genuine issue of material fact without independent evidence that discrimination was the real reason for the adverse employment action."  *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000) (citation omitted); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 148 (2000).[9]  This is because a plaintiff's prima facie case, along with sufficient evidence that the employer's proffered reason is false, may permit a factfinder to infer that the employer intentionally discriminated.  *Reeves*, 530 U.S. at 148.

Such a showing will not prevent summary judgment in every case, however, because in some cases "although [a] plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory."  *Id.*; *see also Price*, 283 F.3d at 720.  The fact "that the employer's proffered reason is unpersuasive . . . does not necessarily establish that the plaintiff's proffered reason is correct."  *Hicks*, 509 U.S. at 524.  To find in favor of the plaintiff, it "is not enough [for the factfinder] . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination."  *Id.* at 519 (emphasis in original).  The ultimate burden of persuasion rests squarely on the plaintiff.  *Reeves*, 530 U.S. at 143.  As such, courts

---

[9] "Although *Reeves* was based on a motion for judgment as a matter of law, the standard is the same for summary judgment."  *Price*, 283 F.3d at 720 n.1 (citation omitted).

may consider a number of factors in deciding whether summary judgment is appropriate,
including "the probative value of the proof that the employer's explanation is false, and any
other evidence that supports the employer's case." *Id.* at 148-49. Summary judgment may be
particularly appropriate where "the plaintiff create[s] only a weak issue of fact as to whether the
employer's reason was untrue and there [is] abundant and uncontroverted independent evidence
that no discrimination . . . occurred" *or* where "the record conclusively reveal[s] some other,
nondiscriminatory reason for the employer's decision." *Id.* at 148.

Plaintiff offers several arguments to show that Defendants' proffered reasons are
pretextual. Ultimately, however, the Court concludes that although Plaintiff has made out a
prima facie case and presents evidence rebutting the defendant's explanation, no rational
factfinder could find that Plaintiff's termination was discriminatory. The Court arrives at this
conclusion for two reasons. First, Plaintiff has created only a weak issue of fact as to whether
Defendants' reasons are untrue. Second, the record conclusively reveals another,
nondiscriminatory reason for the employer's decision: regardless of whether Turner actually was
a good employee, Defendants had a reasonable basis to believe Turner's work performance was
poor. The Court finds this reason particularly significant because Title VII is not intended to
protect against "unfair or unwise business decisions," but against discriminatory decisions.
*Nieto v. L & H Packing Co.*, 108 F.3d 621, 624 (5th Cir. 1997) (citation omitted); *see also Rios
v. Rossotti*, 252 F.3d 375, 380 (5th Cir. 2001) ("this Court affords a high degree of deference to
employers" in their business decisions); *Jones v. Flagship Int'l*, 793 F.2d 714, 729 (5th Cir.
1986) (holding that employer was not liable for discrimination under Title VII where the
employer had a reasonable basis or good faith ground for believing in its proffered reason for

terminating the plaintiff).

Plaintiff has created only a weak issue of fact as to whether Defendants' reasons are untrue because there is little probative value in Plaintiff's proof that Defendants' explanations are false. To demonstrate pretext, Plaintiff first submits that she received a merit-based pay raise eight months before she was fired. (Pl.'s Br. in Resp. at 14.) Plaintiff also offers evidence that she received positive feedback and a bonus from Boring while she was working alone at the Foundation before Colston was hired. *Id.* Plaintiff alleges that Boring, who enjoyed working with Plaintiff, was surprised that Colston experienced problems with Plaintiff and was unhappy with the way Colston addressed these problems. *Id.* at 17. These facts suggests that Plaintiff may have been a good employee eight months before she was fired. During the interim before Colston was hired, however, Plaintiff was under minimal supervision. (Pl.'s App. at 38; Defs.' App. at 74-75.) As such, Boring could have reasonably overlooked any of Plaintiff's shortcomings. In any case, these allegations do not demonstrate that during the few months preceding Plaintiff's termination, under new supervision and in a different office, Plaintiff completed her work accurately and timely, followed a work schedule, and kept personal matters out of the office.

To further support her contention that Defendants' proffered reasons are pretextual, Plaintiff alleges that Defendants failed to follow disciplinary procedures as set out in the employee handbook. Although Turner received written criticism for her poor work performance in 2000 (Defs.' App. at 92, 95), Turner received only verbal warnings from Colston concerning her work quality, schedule, and personal time. (Defs.' App. at 83-84, 86.) Regardless, "a defendant's failure to follow its own policy is not probative of discriminatory animus in the

absence of proof that the plaintiff was treated differently than other non-minority employees because Title VII does not protect employees from the arbitrary employment practices of their employer, only their discriminatory impact." *Upshaw v. Dallas Heart Group*, 961 F. Supp. 997, 1002 (N.D. Tex. 1997).  Because Plaintiff offers no evidence that she was treated differently than other employees in this respect, Defendants' alleged failure to follow its disciplinary procedures is not significant evidence of pretext.

As additional evidence that Defendants' proffered reasons are false, Plaintiff submits that Boring did not respond to an e-mail she sent him about her problems with Colston, that Boring allowed Colston to decide whether to terminate Turner, and that in one instance when Colston and Boring were discussing Turner, Colston told Boring that she expected Turner to use her "race card."  (Pl.'s Br. in Resp. at 14, 17.)  Further, Plaintiff asserts that Colston was often held accountable for the mistakes attributed to Turner and that Colston resigned five months after Turner was terminated.  *Id.* at 17.  Even accepting all of these allegations as true, none of them indicate that Plaintiff completed her work accurately and timely, that she followed a work schedule or that she did not spend an excessive amount of time attending to personal matters while at work.

Finally, Plaintiff offers her self-serving Declaration, in which she controverts many of Defendants' proffered reasons.  Plaintiff claims that she consistently finished her work in a timely and accurate manner, that she complied with her supervisor's wishes regarding her work schedule, and that she did not spend inappropriate amounts of time attending to personal matters during business hours.  (Pl.'s App. at 5-14.)  She also claims to have been receptive to changes in her work environment.  *Id.* at 9.  However, the self-serving statements contained within Plaintiff's Declaration are inconsistent with her own deposition testimony.

For example, in Plaintiff's Declarations she claims that any "inaccuracy of the reports was caused by Colston" because although Plaintiff "inputted all of the information [she] received correctly, . . . [she] was not given all the information by either Colston or Boring." *Id.* at 9-10. She also claims that she "master[ed]" Excel. *Id.* at 9. However, in her deposition, which is itself full of contradictions, Plaintiff concedes that she had some difficulty with Excel. Plaintiff's deposition reveals that, at least on one occasion, Plaintiff's inaccuracy caused a report deadline to be missed. After Colston and Turner worked on numerous drafts of this particular report, the report Turner presented to Colston remained full of mistakes, including a mistake in the key, formatting errors, and misplaced and missing numbers:

> Q.   Now, you said earlier that she hammered you unnecessarily about the Excel report.
>
> A.   I felt like she did.
>
> Q.   What exactly did she say?
>
> A.   Well when we began– you know, after she gave me the format and I entered the information to the Excel report, initially she came out to my desk and we talked about it. And she was showing me something on the report where I– I spelled something out, which was our little key for the different columns on the report. And I abbreviated it. And she was very upset about that. We're not talking about numbers. We're talking about something that I spelled out and she abbreviated it on the key. . . and she mentioned something about the– We were talking about the format.
>   And I told her, I said, Well, I talked to Theresa in accounting because she's an Excel expert, and whatever we want, she can make this form, you know, really look good, format it perfectly and that kind of thing . . . And I said she can help us, you know, just making this, you know, work for us once we get it– once we iron out what we want on the report. And she said, I've already talked to accounting, and there's no need for you to talk to accounting . . .
>   And, yes, there was some corrections to be made, but it was just in– it was– that was not going to be sent out to our Board because we had to work out the bugs– in the format . . . there were numbers that we needed to move around or add. There were revisions to be made but– Because she had– I'm trying– We did so many drafts of this report, you know,

getting it worked out to where it was going to be what we needed it to be.
And we were just going back and forth, back and forth, back and forth.

(Defs.' App at 87-88.)  In another account of the same incident, Plaintiff asserts that Colston said

she did not have time to go over the corrections with Turner.  *Id.* at 90-91.  Ultimately, however,

Turner concedes that she corrected the report with assistance from Theresa in the accounting

department, evidencing the fact that the corrections required were format-related, not the result

of insufficient information provided by Colston or Boring.  *Id.*

Furthermore, despite Plaintiff's claim in her Declaration that she "never had a problem

cooperating with Colston and [she] was always receptive to any approach [Colston] had" (Pl.'s

App. at 12), Plaintiff's deposition reveals several instances of insubordination on her part.  For

example, despite Colston's instruction to the contrary, Turner got help from Theresa to correct

the report.  (Defs.' App at 87, 90.)  When Colston made phone calls to board members informing

them that the report would not be ready because of Turner's mistakes, Turner confronted

Colston, saying,

> Mary, I think it's unfair for you to tell me that you– that, first of all, to tell me
> that you don't have time to point out to me what I need to do to get the form
> corrected.  But I overhear you talking to Board members that I made the mistake
> and because of that, we're not going to have a report . . . I think that's unfair.

*Id.* at 90.  Another time, when Colston told Turner she wanted her to take her lunches at

11:30 a.m., Turner questioned Colston.  Turner recounts,

> I asked her, Well, why?  Why are you changing my lunchtime because I– you
> know, I'm not even hungry until– It's almost 2 o'clock, you know before I ever
> get hungry.  And she said, Well, that's just what time I want you to go.  And I
> questioned her about it.

(Defs.' App at 90.)

Moreover, Plaintiff does not even attempt to deny having ridiculed Colston to officers and directors of the Foundation.  Hence, Plaintiff's evidence does not sufficiently rebut Defendants' assertion that Plaintiff's work performance was poor.

Regardless of whether Turner actually was a good employee, however, the record establishes that Defendants had a reasonable basis to believe Turner's work performance was poor.  As discussed directly above, Plaintiff challenged her supervisor's authority a number of times.  She also required help to complete her work in Excel.  Further, Plaintiff admits that she received a significant amount of personal e-mail at her business e-mail address even though she claims not to have read these e-mails.  *Id.* at 113-16.  As such, even assuming Plaintiff has offered evidence rebutting the nondiscriminatory reasons offered by Defendants, this evidence is not so persuasive as to support an inference that the real reason for Plaintiff's termination was discrimination.

Plaintiff has not presented the Court with other evidence of discriminatory intent from which a rational factfinder could conclude that the Plaintiff's termination was discriminatory.  Other than Colston's "race-card" comment, Plaintiff does not cite Colston's race-related comments as evidence of pretext.  Nonetheless, while these comments may have demonstrated some insensitivity, including the comments regarding Colston's  experiences working with inner city children and Colston's discussion of a special university program for African-American students, they do not demonstrate racial animus.  *Cf. Reeves*, 530 U.S. at 151 (finding evidence of discriminatory animus where a plaintiff was told he "was so old he must have come over on the Mayflower" and "he was too damn old to do [his] job").  Accordingly, Plaintiff's race discrimination claim cannot survive summary judgment.

     **B.**      **Hostile Work Environment**

In order to establish a prima facie case for a hostile work environment claim, a plaintiff must show that (1) she is a member of a protected class, (2) she was subjected to harassment, (3) the harassment was based on the protected trait, (4) the harassment affected a term or condition of her employment, and (5) the employer knew or should have known about the harassment and failed to take prompt remedial action. *Felton v. Polles*, 315 F.3d 470, 484 (5th Cir. 2002); *see also Long v. Eastfield College*, 88 F.3d 300, 309 (5th Cir. 1996). Whether an environment is hostile or abusive depends on the totality of the circumstances, with a focus on factors such as the frequency of the conduct, the severity of the conduct, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance. *See Long*, 88 F.3d at 309; *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22-23 (1993).

To survive summary judgment on a hostile work environment claim, a plaintiff must produce evidence from which a reasonable jury could find that the alleged harassment was not merely sporadic but that the workplace was "permeated with discriminatory intimidation, ridicule and insult . . . sufficiently severe or pervasive to alter the conditions of [a plaintiff's] employment and create an abusive working environment." *Harris*, 510 U.S. at 21; *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 594 (5th Cir. 1995). Conduct that is not severe or pervasive enough to create an objectively hostile work environment is beyond Title VII's purview. *See DeAngelis*, 51 F.3d at 594.

Furthermore, "[t]he Supreme Court has contrasted physically threatening or humiliating conduct, which will support a claim for hostile work environment, from a 'mere offensive utterance' which will not." *Long*, 88 F.3d at 309; *see also Harris*, 510 U.S. at 21. The Fifth Circuit has held that the mere utterance of an epithet which engenders offensive feelings in an

employee is not, taken alone, sufficient to support Title VII liability.  *See, e.g., Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 806 (5th Cir. 1996); *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996); *DeAngelis*, 51 F.3d at 594.

Plaintiff claims that Colston's harassment created a hostile work environment.  To support her claim for harassment, Plaintiff alleges that Colston: (1) told Turner about her experiences working with inner city children, referring to them as "ghetto children;" (2) informed Turner of a university program geared toward African-American students who could not qualify for regular admission; (3) reacted with surprise when she learned that Turner shopped at a particular high-end shopping mall; (4) reacted with surprise when she learned that Turner drove a Volvo; (5) reacted with surprise when she learned that, as a hobby, Turner's son bought and sold cars on credit; (6) reacted with surprise when Turner successfully completed a project or report; (7) became angry with Turner for "no rational reason;" and (8) falsely accused Turner of having a poor work performance.  (Pl.'s App. at 1-2, 13.)  Plaintiff concedes that when Plaintiff told Colston she did not want to hear any more about Colston's work with inner-city children, Colston did not mention the topic again.  (Defs.' App. at 102.)

Defendants contend that Plaintiff's hostile work environment claim fails as a matter of law because Plaintiff cannot demonstrate that the alleged harassment was so severe or pervasive that it affected a term, condition or privilege of her employment.  (Defs.' Br. in Supp. of Mot. Summ. J. at 22.)  The Court agrees.  Based on the facts alleged by Plaintiff, no reasonable jury could find that Turner's work environment was "permeated with discriminatory intimidation, ridicule and insult."  Although Colston's alleged conduct may have "engender[ed] offensive feelings" in Turner, the conduct was not "physically threatening or humiliating."

Plaintiff attempts to analogize her case to *Walker v. Thomas*, in which the Fifth Circuit

found that the appellants "created a fact issue with respect to whether the racial insults they endured were sufficiently severe or pervasive" to create a hostile work environment. 214 F.3d 615, 626 (5th Cir. 2000). However, the facts of *Walker* are remarkably different from those alleged by Plaintiff. The appellants in that case were

> at various times [] subjected to: comparisons to slaves and monkeys, derisive remarks regarding their African heritage, patently offensive remarks regarding the hair of African-Americans, and conversations in which a co-worker and supervisor used the word "nigger." The office manager also informed them that the vice-president did not want the African-American women to talk to each other. Further, . . . an African-American woman not party to [the] suit[] resigned because she felt she could no longer tolerate the racism and discrimination at [the appellants' workplace].

*Id.* A comparison of these facts to those alleged by Plaintiff further clarifies that the conduct alleged by Plaintiff was not severe or pervasive enough to satisfy the standards articulated by the Supreme Court or the Fifth Circuit. Accordingly, Turner's hostile work environment claims fails as a matter of law.

### C.    Retaliation

To establish a prima facie case of retaliation, Plaintiff must demonstrate that: (1) she engaged in a protected activity, (2) an adverse employment action occurred, and (3) a causal link exists between the protected activity and the adverse employment action. *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 414 (5th Cir. 2003). A plaintiff engages in protected activity when she opposes behavior that violates Title VII. *See* 42 U.S.C. § 2000e-3(a). A plaintiff need not prove that the practices she opposed were actually unlawful, but only that she had a reasonable belief that the employer was engaged in unlawful employment practices. *Byers v. Dallas Morning News*, 209 F.3d 419, 428 (5th Cir. 2000) (citing *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. 1981)).

Defendants argue that Plaintiff cannot establish a prima facie case of retaliation because Plaintiff did not engage in any activity protected by Title VII. (Defs.' Reply at 16-17.) In support of her retaliation claims, Plaintiff argues that she engaged in two acts of opposition to practices she reasonably believed to be unlawful under Title VII. Turner first asserts that she complained of racial discrimination when in response to Colston's stories about her work with inner city children, Turner told Colston to "[p]lease refrain from making reference to [her] race, that [she] did not feel inferior, and that [she] hoped [they] could continue to work together without [her] race being an issue." (*See* Pl.'s Br. in Resp. at 21; Defs.' Reply at 15-16; Pl.'s App. at 2.) Although this alleged request purports to complain of racial discrimination, the Court finds Turner's belief that Colston's stories violated Title VII objectively unreasonable. When this alleged opposition occurred, the only harassment alleged to have taken place was Colston's storytelling about her work with inner city children. (*See* Pl.'s Br. in Resp. at 4.) Given the above-stated standards for hostile work environment, *see supra* p. 13, no reasonable person could have believed that Colston's storytelling, or even use of the term "ghetto children" in this context, could have violated Title VII. *See Byers*, 209 F.3d at 428-29. Therefore, Turner's request that Colston refrain from discussing this topic with her does not constitute a protected activity.

Plaintiff also alleges that she engaged in opposition a second time when she "attempted" to make complaints to Boring and Wright by sending them an e-mail. (*See* Pl.'s Br. in Resp. at 21; Defs.' Reply at 15-16.) However, the e-mail she references does not complain of racism; it contains no discussion of racial discrimination. (*See* Pl.'s App. at 117.) Rather, the e-mail contains Plaintiff's complaints about being told when to have lunch and leave the office and her poor relationship and communications with Colston. *See id.* As such, Turner's e-mail to Boring

and Wright does not constitute protected activity.

Because Plaintiff cannot demonstrate that she engaged in protected activity, she cannot establish a prima facie case of retaliation.  Hence, the Court has determined that none of Plaintiff's claims survive summary judgment.  Defendants' Motion for Summary Judgment is therefore GRANTED in its entirety.

## V.    Evidentiary Issues

In Plaintiff's First Motion to Strike, Plaintiff objects to several portions of the Appendix submitted in support of Defendants' Motion for Summary Judgment.  Specifically, she objects to (1) statements made by Wright concerning an alleged transfer and demotion, (2) Colston's statement that Boring said Plaintiff would be terminated because of her poor performance, (3) statements made by Colston concerning complaints from other departments, and (4) statements made by Courtenay Tanner concerning thank you letters and personal phone calls.  (Pl.'s Br. in Supp. of First Mot. to Strike at 2-3.)  Because the Court does not rely on these portions of Defendants' Appendix in its conclusion of the summary judgment motion, the Court hereby DENIES these objections as MOOT.  Plaintiff also objects to extraneous portions of depositions being included in Defendants' Appendix, but not referenced by Defendants in their Motion.  *Id.* Because the Court finds some of these portions, particularly those in Plaintiff's deposition, helpful to its understanding of Plaintiff's Declaration, the Court DENIES this objection and exercises its discretion not to strike these portions of the record.

Defendants also submit a Motion to Strike, in which Defendants argue that Plaintiff's Declaration submitted in support of her Response to the summary judgment motion should be stricken.  Defendants contend that the Declaration should be stricken because several statements contained in the Declaration directly contradict Plaintiff's prior deposition testimony.  (Defs.'

Mot. to Strike at 1-2.)  Defendants also put forth several evidentiary objections to the

Declaration.  (Defs.' Br. in Supp. of Mot. to Strike at 28-33.)  Based on Defendants' contention

that the Declaration was submitted in bad faith, Defendants also request that the Court award

them attorneys fees for the preparation of their Motion to Strike.  (Defs.' Mot. to Strike at 2.)

Even considering the Declaration, the outcome of this summary judgment motion is not affected.

Therefore, the Court DENIES as MOOT Defendants' requests that Plaintiff's Declaration not be

considered.  Moreover, the Court is not satisfied that Plaintiff's Declaration was submitted in bad

faith or solely for the purposes of delay; so, the Court DENIES outright Defendants' request for

attorney's fees.

In response to Defendants' Motion to Strike, Plaintiff files a Motion for Leave requesting

that the Court allow her to file an oversized brief and supplemental appendix.  (Pl.'s Mot. for

Leave at 1.)  Although Defendants do not oppose this filing, because the Court denies

Defendants' Motion to Strike, the Court also DENIES Plaintiff's Motion for Leave as MOOT.

The Clerk is directed to unfile Plaintiff's Brief in Support of Response to Defendants' Motion to

Strike and Appendix in Support of Plaintiff's Response to Defendants' Motion to Strike, both of

which were filed on January 29, 2005.

In Plaintiff's Second Motion to Strike, Plaintiff objects to portions of the Appendix to

Defendants' Motion to Strike on the grounds that certain portions of this Appendix were not

contained in the Appendix to Defendants' Motion for Summary Judgment.  (Pl.'s Second Mot. to

Strike at 1.)  Additionally, Plaintiff asserts that Defendants' Motion to Strike should be stricken

because it is without merit.  *Id.* at 2.  Again, because the Court denies Defendants' Motion to

Strike, the Court DENIES Plaintiff's Second Motion to Strike as MOOT.

## VI.    Conclusion

For the above-stated reasons, the Court GRANTS Defendants' Motion for Summary Judgment.  The Court DENIES AS MOOT a portion of Plaintiff's First Motion to Strike, a portion of Defendants' Motion to Strike, Plaintiff's Second Motion to Strike in its entirety, and Plaintiff's Motion for Leave in its entirety.  To the extent Plaintiff's First Motion to Strike and Defendants' Motion to Strike are not denied as moot, the Motions are DENIED outright.

**IT IS SO ORDERED.**

Signed this 31st day of May 2005.

_____
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE